Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1902 | **DATE** | 7/19/2001 |
| **CASE TITLE** | STELLA BOND vs. MICHAEL SHEAHAN | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is Denied (#31). Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUL 1 9 2001
date docketed

ED-7
FILED FOR DOCKETING

01 JUL 19 PM 4: 43

docketing deputy initials

date mailed notice

Document Number

AC6

courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

United States District Court
Northern District of Illinois
Eastern Division

STELLA BOND,                          )
                                      )
        Plaintiff,                    )      No. 99 C 1902
                                      )
        v.                            )
                                      )
MICHAEL SHEAHAN,                      )      Magistrate Judge
        Sheriff of Cook County,       )      Arlander Keys
                                      )
        Defendant.                    )

DOCKETED
JUL 1 9 2001

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff Stella Bond sued Defendant Michael Sheahan, in his official capacity as Sheriff of Cook County, for disability discrimination under the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. 12101 *et seq.* (West 2001). For the reasons set forth below, the Court denies Defendant's Motion.

### FACTUAL BACKGROUND

This controversy arises out of Defendant's alleged failure to reasonably accommodate Ms. Bond's asthma. Defendant contends that Plaintiff is not protected by the ADA, because she is not a "qualified individual with a disability", as defined by the Act. Defendant further asserts that, even if Ms. Bond were covered by

1



the ADA, Defendant accommodated Ms. Bond's asthma by re-assigning her to a smoke-free workplace, and by enacting non-smoking policies throughout the Cook County Department of Corrections ("CCDOC"). Plaintiff counters that she is a "qualified individual with a disability", and that Defendant did not, in fact, reasonably accommodate her disability. Plaintiff also contends that she was constructively discharged from her position at the CCDOC, because of Defendant's failure to reasonably accommodate her disability.

Ms. Bond began working as a correctional officer for the Cook County Sheriff's Department at the CCDOC on February 1, 1978, and continued in that capacity until her resignation on February 28, 1998. (Defendant's Statement of Uncontested Facts ["Def.'s SUF"] ¶ 2.) During the course of her employment, Plaintiff received performance reviews indicating that she was competent in all job areas, and maintained a satisfactory attendance record, often carrying more than thirty days of unused medical time off. (Def.'s SUF ¶¶ 4-5; Def.'s SUF Ex. 2a-f.)

Prior to 1989, Ms. Bond, apparently, had no recorded health problems, and had not made any complaints about her work environment. However, in December 1989, Plaintiff suffered a pulmonary embolism, forcing her to miss several weeks of work in order to fully recuperate. (Def.'s SUF ¶ 8.) After returning to

work, Ms. Bond began complaining to her union steward (Yvonne Taylor), supervisors, co-workers, and various state agencies about the presence of secondhand tobacco smoke at the CCDOC. (*See* Plaintiff's Response to Defendant's Local Rule 56.1(a)(3) Statement of Facts and Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts ["Pl.'s Resp."], Ex. 1 at 104-105; Ex. 8; Ex. 10; Ex. 11 at 29; and Ex. 12 at 17-18.)

In December 1992, a physician from Humana Health Care Plans wrote a "To Whom It May Concern" letter, recommending that Ms. Bond "should be completely in a non-smoking environment" (Def.'s SUF Ex. 22). Defendant allegedly accommodated this request, on May 11, 1993 (more than five months after the doctor's letter), by administratively transferring Ms. Bond from her position in the records department in Division V to Division VIII.[1] (Def.'s SUF ¶

---

[1] As explained *infra*, whether this transfer constitutes an accommodation for purposes of the ADA is a disputed issue of material fact. While Defendant maintains that Division VIII is the only completely smoke-free area in the CCDOC (Def.'s SUF ¶ 22) – and, therefore, was an accommodation – Ms. Bond contends that Cermak Hospital in Division VIII is the only completely smoke-free part of Division VIII, and that she was not transferred there. (Pl.'s Resp. ¶¶ 22,23,88.) In other words, according to Ms. Bond, while she was transferred to Division VIII in 1993, this was not an accommodation, as there was still tobacco smoke in the areas where she worked. Furthermore, Plaintiff alleges that she was transferred for administrative purposes only (not as an accommodation for her asthma), since four officers, including herself, were transferred from Division

(continued...)

23.) Plaintiff remained in Division VIII for only six months, and returned to Division V after successfully grieving her transfer on the grounds that she was not eligible for overtime pay in Division VIII. (Def.'s SUF ¶ 24.) Upon her return to the records department in Division V, Ms. Bond was assigned to the midnight shift, where Defendant believed "there would be fewer people, and therefore less people smoking." (Def.'s SUF ¶ 25; Memorandum in Support of Defendant's Motion For Summary Judgment ["Def.'s Memo"] at 15.) Three months later, Ms. Bond bid into the day shift in classifications, another department in Division V. (Def.'s SUF ¶ 26.) Plaintiff continued working in classifications for nearly five years before resigning from the CCDOC in February 1998. (Def.'s SUF ¶ 26.)

Although the parties dispute what steps Defendant took to accommodate Ms. Bond, it is undisputed that the Sheriff's Department codified its 1990 smoking policy, which prohibited smoking in all but designated areas, by enacting General Order 1.16

---

(...continued)
V to Division VIII on May 11, 1993. (Def.'s SUF Ex. 27). According to Ms. Bond, Lieutenant Andrews had allowed his favorites to remain in the records department in Division V, and transferred her, as well as other employees, to other divisions (such as Division VIII) where there was no overtime. Ms. Bond filed a grievance, which she won, and was further credited 200 hours of time due. (Pl.'s Resp. ¶ 23.)

on July 1, 1993. (Def.'s SUF ¶ 30.) However, smoking continued in all areas of the CCDOC despite the enactment of this General Order. Specifically, the Illinois Department of Labor ("IDOL"), in response to Ms. Bond's initial complaint, inspected the CCDOC on March 24, 1994, and determined that the CCDOC's smoking policy was not being enforced, in violation of the Illinois Clean Air Act and the City of Chicago Municipal Code 192-20. (Pl.'s Resp. Ex. 14.) After waiting another year for the CCDOC to comply with its own smoking policy, Ms. Bond filed a second complaint with IDOL on March 9, 1995, explaining that the CCDOC's smoking policy was still not being enforced. (Pl.'s Resp. Ex. 8.)

On March 27, 1995, Ms. Bond was diagnosed as having "mild persistent" asthma.[2] (Pl.'s Resp. ¶ 11.) Plaintiff's treating physician, Dr. Thelma Evans, initially prescribed Ms. Bond one albuterol inhaler for treatment (Def.'s SUF ¶ 12), and later, on July 13, 1995, directed her to avoid cigarette smoke, since it is one of several irritants known to aggravate a person's asthma.[3]

_____

[2] Asthma can be categorized into four degrees of severity: (1) mild intermittent; (2) mild persistent; (3) moderate persistent; and (4) severe. (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 19.) Both parties agree that Ms. Bond's asthma was not related to, or affected by, her pulmonary embolism. (Def.'s SUF ¶ 9.)

[3] According to Dr. Evans, Ms. Bond's asthmatic condition became progressively worse. While Dr. Evans initially prescribed
(continued...)

(Pl.'s Resp. ¶ 50; Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 36.)  After

learning that Ms. Bond was exposed to environmental tobacco smoke

everyday at the CCDOC, Dr. Evans wrote a "To Whom It May Concern"

letter to Ms. Bond's employer on January 18, 1996, explaining that

Plaintiff's "asthma is aggravated by constant exposure to tobacco

smoke in her work environment."  (Def.'s SUF Ex. 23.)

Apparently, in response to Ms. Bond's complaints, Division V

Superintendent Dennis Drahos issued a "new" smoking policy on July

1, 1996,[4] which established procedures for both the smoking and

---

[3](...continued)
only a Maxair auto inhaler for Ms. Bond's asthma, she later
increased her prescriptions due to continuing and worsening
symptoms. (Pl.'s Resp. ¶ 11.)  On June 12, 1995, Dr. Evans added
a steroid inhaler to Ms. Bond's prescription. (*Id.*) On May 9,
1996, because Ms. Bond's symptoms were worsening, Dr. Evans added
a home nebulizer unit and peak flow meter to Ms. Bond's
prescription.  (*Id.*)  By January 8, 1997, Ms. Bond was using
Proventil and Vanceril metered dose inhalers.  (*Id.*) On May 2,
1997, Dr. Evans prescribed Prednisone and Biaxin, which are used
in the treatment of asthma for reducing the inflammation of the
airways .  (*Id.*)  In other words, according to Dr. Evans, between
Ms. Bond's diagnosis of asthma in 1995 and her alleged
constructive discharge in 1998, Ms. Bond's asthma became
progressively worse, as she went from a single inhaler, to using
two inhalers, to using three inhalers, to using three inhalers
plus a home nebulizer, and then intermittent courses of
Prednisone.  (*Id.*)
   [4] For clarification, Defendant states that this smoking
policy was a reissue of General Order 1.16.    (Def.'s SUF ¶ 32.)
Plaintiff contends that this smoking policy was not a reissue of
General Order 1.16, but, rather, was related to General Order
1.16.  (Pl.'s Resp. ¶ 32.)

non-smoking areas in Division V.[5] (Def.'s SUF ¶ 33.) John Maul, Assistant Executive Director at the CCDOC, explained that supervisors could impose progressive disciplinary sanctions upon employees violating the smoking policy, commencing with counseling, continuing through suspension, and ending in termination for chronic offenders. (Def.'s SUF ¶ 34.) Mr. Maul further stated that, since General Order 1.16's inception, he has issued verbal warnings to approximately one dozen employees, but has never given written reprimands or issued counseling forms to any employees. (Pl.'s Resp. ¶ 34.)

Despite this "new" smoking policy, some individuals continued to smoke where Ms. Bond worked. On February 28, 1997, the University of Illinois at Chicago conducted an evaluation of the indoor air quality rates at the CCDOC. (Pl.'s Resp. Ex. 5.) The Cermak Health Clinic at the CCDOC requested this evaluation because "there had been concerns and complaints about the air quality from medical staff and corrections officers working in the area." (Pl.'s Resp. Ex. 5 at p. 2.) While the report found the overall

---

[5] This smoking policy required all non-smokers, such as Ms. Bond, who objected to, or observed, others smoking in a non-smoking areas, to notify their supervisors before filing a complaint. Lieutenant Willie Baskin, Ms. Bond's supervisor in the records department, indicated that Plaintiff followed this procedure. (Pl.'s Resp. Ex. 11, Baskin Dep. at 30.)

supply rates to be generally adequate for the facility, it suggested means by which the air quality could be improved, including "limit smoking in the areas completely, or at least to specific areas and/or cells which have good exhaust immediately adjacent to them."[6] (Pl.'s Resp. Ex. 5 at p. 12.)

Between May 29 and June 16, 1997, Plaintiff missed work, as explained in the Return to Work form completed by Dr. Evans, due to "exacerbation of asthma."[7] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 77; Def.'s SUF Ex. 20.) On July 1, 1997, Dr. Evans wrote a second "To Whom It May Concern" letter, indicating that Ms. Bond's "respiratory problems are aggravated by exposure to cigarette smoke, dust, fumes, and exposure to extremes of temperature and humidity." (Def.'s SUF Ex. 24.) According to Ms. Bond, although

---

[6] This report also included the following conclusions: (1) "[s]moking is currently permitted in the facility for the inmates, officers, and other staff;" (2) "[c]igarette smoke and other contaminants were not controlled by the ventilation system;" (3) "[p]articles are generated by several known sources in this location: human skin and hair, dust, smoke, outdoor air, and deteriorating building materials;" and (4) the quantity of particulate matter in the air at CCDOC intake is well under the average standards set forth by OSHA for industrial environments, but in excess of Canadian Exposure Guidelines for Residential Air Quality. (See Pl.'s Resp. Ex. 5.)

[7] While Defendant acknowledges that Ms. Bond missed work, Defendant emphasizes that Dr. Evans reported on a Humana health form, on June 2, 1997, that Ms. Bond's chest was clear. (Def.'s SUF ¶ 16.) However, Dr. Evans also listed on the health form "exacerbation of asthma." (See Def.'s SUF Ex. 19.)

she gave the July 1st letter to her supervisor, Lieutenant Kurtevich, as well as the Personnel Department, she received no response. (Pl.'s Resp. ¶¶ 63-64.)   Dr. Evans then wrote a third, and final, "To Whom It May Concern" letter on October 3, 1997, requesting that Ms. Bond be given a parking space close to her worksite, since her asthma was affected by dust and wind.[8] (Def.'s SUF ¶ 36.)   While these letters indicated a number of possible irritants of Ms. Bond's asthma, Dr. Evans stated that she believed cigarette smoke was "the only thing that consistently seemed to aggravate [Ms. Bond's asthma]." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 49.)   Dr. Evans also stated that, depending on the presence of certain irritants in the workplace, many asthmatics can continue working with the aid of medication.[9] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 53.)

---

[8] The parties agree that Defendant complied with this request.  As explained *infra*, since the Court finds that triable issues exist as to whether Plaintiff suffers from an actual disability, rather than a perceived disability, the fact that Defendant issued Ms. Bond a handicapped parking pass has no bearing on this case.

[9] As explained *infra*, it is a question of fact whether Ms. Bond, while on her medications, was substantially limited in her ability to breathe when she was exposed to smoke, compared to an average person in the general community.  (*See* Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 103.) Significantly, Dr. Evans noted in the January 18, 1996 Return to Work Letter that Ms. Bond was "symptomatic in spite of appropriate treatment." (Def.'s SUF Ex. 23.)

9

After 1995, Ms. Bond's asthma became "slightly worse," requiring Dr. Evans to increase Plaintiff's prescription from one inhaler to three, and to add a home nebulizer and intermittent courses of Predisone to her treatment. (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 100.) In Dr. Evans' deposition, which was taken on November 13, 1999, she stated that, a year ago (when Ms. Bond was not working at the CCDOC), her asthma was "controlled"[10] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 100), but that Ms. Bond still experienced occasional flare-ups of her asthma, despite the absence of cigarette smoke from her daily environment. (Def.'s SUF ¶ 42.)

Effective February 28, 1998, Ms. Bond resigned from the CCDOC. (Def.'s SUF ¶ 3.) Plaintiff asserts that her resignation was not voluntary; rather, she claims that Defendant forced her to retire as a direct result of the negative effects of her working conditions on her health. (Pl.'s Resp. ¶ 3.) Defendant rejects this contention, explaining that Ms. Bond's exit interview form

---

[10] The parties dispute whether Ms. Bond's asthma was "uncontrolled" while she worked at the CCDOC. Specifically, when deposed, Dr. Evans responded, "It was controlled" when asked, "Hadn't [Ms. Bond's asthma] gotten better [since she left work]?" (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 100.) Dr. Evans also indicated that "apparently [the medication] was not controlling [Ms. Bond's asthma] since she was still symptomatic while she was at work." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 103.) Because there are material facts in dispute as to whether Ms. Bond's asthma was "uncontrollable" while working at the CCDOC, the issue will be left for the factfinder.

reflects "retirement" as the sole reason for her resignation. (Def.'s SUF ¶ 3.) Plaintiff explains that she merely signed and dated the exit interview form, and did not herself write down "retirement" as a reason for her leaving. (Pl.'s Resp. Ex. 2, Bond Aff. ¶ 1.) Ms. Bond acknowledges that she has not actively sought employment since her resignation in 1998. (Def.'s SUF Ex. 10, Bond Dep. at 16.) She worked for Defendant for exactly twenty years.

## PROCEDURAL HISTORY

Ms. Bond filed a Charge with the Equal Employment Opportunity Commission ("EEOC") on October 27, 1995, alleging disability discrimination. On December 30, 1998, Ms. Bond received a right to sue letter from the EEOC. Ms. Bond timely filed this lawsuit, alleging disability discrimination in violation of the ADA, in federal court on March 23, 1999. Defendant filed its Motion for Summary Judgment on March 30, 2001.

## DISCUSSION

I.   Summary Judgment Standard of Review

The Federal Rules of Civil Procedure endorse motions for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*
477 U.S. 317, 322 (1986). When confronted with a motion for
summary judgment, the nonmovant may not rest upon its pleading, but
must present specific facts demonstrating that a genuine issue for
trial exists. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248
(1986). This requires the party opposing summary judgment to do
more than show that "there is some metaphysical doubt as to the
material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.,* 475 U.S. 574, 586 (1986). Summary judgment must be denied
if the parties dispute facts that, under governing law, might
affect the result of the litigation. *Anderson,* 477 U.S. at 248.

The Court construes all facts and draws all reasonable
inferences therefrom in the light most favorable to the nonmoving
party when ruling on a motion for summary judgment. *Matsushita,*
475 U.S. at 587. Furthermore, it is the jury, not the court, that
determines credibility, weighs evidence, and draws all reasonable
inferences from the facts. *Anderson,* 477 U.S. at 255. Since
credibility and intent are pivotal issues in the case *sub judice,*
as in most employment discrimination cases, this standard is
applied with added rigor to the present facts. *Schmidt v.
Methodist Hosp. of Ind., Inc.,* 89 F.3d 342, 344 (7th Cir. 1996).

## II. Americans with Disabilities Act Claim

Plaintiff claims that Defendant discriminated against her, in violation of the ADA, by constructively discharging her because of her asthma, a condition that is allegedly aggravated by environmental tobacco smoke, and by not offering her a reasonable accommodation. As will be discussed *infra*, the Court finds that genuine issues of material fact exist concerning whether Ms. Bond was "disabled" for purposes of the ADA, was a "qualified individual" under the Act, and whether Defendant constructively discharged her, or failed to reasonably accommodate her disability.

In order to establish a *prima facie* case under the ADA, a plaintiff must show: (1) that she is "disabled" for purposes of the ADA; (2) that she is "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"; and (3) that the employer took an adverse employment action against her because of her disability, or failed to make a reasonable accommodation. *Stevens v. Illinois Dept. of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000), *cert. denied*, 121 S. Ct. 1187 (2001). Implicit in this analysis is that the employer was aware of the disability at the time of the adverse employment action.[11] *See*

_____

[11] Although Defendant claims it had no knowledge of Plaintiff's asthmatic condition, there is overwhelming evidence
(continued...)

13

*Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999). Each of these *prima facie* elements will be addressed in turn.

### A.    "Disabled"

Under the ADA, an individual is "disabled" if she has (A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual;[12] (B) a record of such an impairment; or (C) being regarded as having such an impairment.[13] 42 U.S.C. 12102(2). Importantly, for the purposes of Defendant's Motion for Summary Judgment, it is not the Court's role to determine whether Ms. Bond was, in fact, "disabled" under the Act; rather, the Court only needs to decide if a rational jury,

_____

(...continued)
to the contrary. (*See* Def.'s SUF Ex. 22-25; Pl.'s Resp. Ex. 8, 10, 11, 12; Pl.'s Resp. ¶¶ 69-75.) Accordingly, the Court concludes that Defendant undoubtedly knew of Ms. Bond's asthmatic condition.

[12] "Major life activities" are defined as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i) (West 2001).

[13] Significantly, the Court's ADA analysis proceeds only under subsection (A), actual disability. In her brief opposing Defendant's Motion for Summary Judgment, Plaintiff argues that she has an actual disability, or in the alternative, that Defendant regarded her as having such an impairment by giving her a parking space close to the CCDOC. She does not argue that she has a record of an impairment. Because the Court finds that genuine issues of material facts exist as to whether Ms. Bond suffers from an actual disability, the Court need not address her contention of being regarded as having such an impairment.

viewing the evidence in the light most favorable to Plaintiff, could reach such a conclusion. *EEOC v. Sears, Roebuck and Co.*, 233 F.3d 432, 438 (7th Cir. 2000).

The Supreme Court instructs the Court to assess whether a particular condition constitutes a disability by following a three-step inquiry. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). First, the Court must determine if Ms. Bond's condition is a physical or mental impairment. *See Id.* Second, the Court must identify an affected life activity upon which Ms. Bond relies, and determine whether it constitutes a major life activity under the ADA. *See Id.* Third, the Court must ask whether the impairment substantially limited[14] the major life activity. *Id.*

To satisfy the first step of this inquiry, the Court looks to 29 C.F.R. § 1630.2(h)(1), which defines a "physical impairment" as

---

[14] The term "substantially limits" means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which she can perform a major life activity, as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). The Supreme Court instructs that "[l]ooking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures — both positive and negative — must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999).

"[a]ny physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following bodily systems: . . . respiratory." Because asthma adversely affects the respiratory system, it undoubtedly qualifies as a "physical impairment."

Turning to the second step, Ms. Bond argues that she is disabled, because she has been substantially limited in the major life activities of breathing, sleeping, walking, and working.[15] While each of these activities constitutes a "major life activity" for purposes of the ADA, (see, e.g., 29 C.F.R. § 1630.2(i) (breathing, walking and working); Bell v. Elmhurst Chicago Stone Co., 919 F. Supp. 308, 309 (N.D. Ill. 1996) (breathing); Silk v. City of Chicago, No. 95 C 0143, 1997 WL 790598, at * 7 (N.D. Ill. Dec. 17, 1997) (sleeping); E.E.O.C. v. Sears, Roebuck & Co., supra, 233 F.3d at 438 (walking); DePaoli v. Abbott Laboratories, 140 F.3d 668, 673 (7th Cir. 1998) (working)), Plaintiff only submits

---

[15] In her Statement of Additional Facts to Defendant's Motion for Summary Judgment, Ms. Bond also indicates that she has been substantially limited in the major life activities of doing housework, dancing, and "engag[ing] in activities that require physical exertion." (Pl.'s Resp. ¶ 68.) Because these activities were not specifically included in Plaintiff's Complaint, nor substantively addressed in either party's briefs, the Court will not determine whether such activities constitute "major life activities" under the ADA.

sufficient evidence that she may be substantially limited with respect to the major life activity of breathing.

### 1. *Major Life Activity of Breathing*

The ADA does not protect all medically afflicted persons; rather, it protects employees who are discriminated against by their employer because they are, in fact, disabled, or perceived to be disabled. *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997). Consequently, an employer does not violate the Act by discriminating against an employee on the basis "of their being (or being believed by him to be) ill, even permanently ill, but not disabled." *Id.* The Court further notes that, depending on the circumstances, "[s]ome impairments may be disabling for particular individuals but not for others." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 952 (7th Cir. 2000)(citation omitted).

The Seventh Circuit has yet to decide an ADA case in which a plaintiff is determined to suffer an *actual* disability on account of having asthma. However, in *Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 807 (7th Cir. 1998), the Seventh Circuit upheld the jury's determination that an employer violated the ADA by *perceiving* an asthmatic employee to be substantially limited in the major life

activity of breathing. In *Riemer*, the employee suffered from "a mild case of asthma" and was reassigned from his position inside the company's fabrication shop to a field position where he worked outdoors. *Id*. The defendant transferred the plaintiff in order to protect him from fumes and dust found in the fabrication shop, which the company believed aggravated the plaintiff's breathing difficulties. *Id*. When the employee's treating physician assured the defendant that it was safe for the plaintiff to return to work inside the fabrication shop, the defendant refused to restore him to his previous position based on its perception of his breathing "disability." *Id*. at 802-803.

While *Riemer* is distinguishable from the case *sub judice* based on its procedural posture (which was an appeal from the district court's denial of a motion for a judgment as a matter of law), and the plaintiff's claimed *perceived* (and not actual) disability, *Riemer*, nonetheless, remains particularly helpful, because the Seventh Circuit concluded that it was the role of the factfinder – not the Court – to determine whether the defendant perceived the plaintiff's "condition as a *substantial* limitation on his ability to breathe." *Id*. at 806; (emphasis in original).

In the case *sub judice*, there is conflicting evidence as to

whether Ms. Bond's asthma substantially limits her ability to breathe and, therefore, rises to the level of a disability. Dr. Evans indicates that, presently, Ms. Bond uses three inhalers, a home nebulizer, and intermittent courses of Prednisone to control her asthma.[16] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 100.) During her employment with CCDOC, Ms. Bond visited Dr. Evans regularly for asthma treatment (Pl.'s Resp. ¶ 66), and missed work between May 29 and June 16, 1997 due to exacerbation of her asthma.[17] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 77; Def.'s SUF Ex. 20.) Dr. Evans also wrote several "To Whom It May Concern" letters, indicating that tobacco smoke aggravated Ms. Bond's asthma (see Def.'s SUF Exs. 23 & 24), and, significantly, that Ms. Bond remained symptomatic despite her medications. (Def.'s SUF Ex. 23; Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 77.) Plaintiff further contends that her asthma prevented her from participating in many activities that she enjoyed

---

[16] The record indicates that Dr. Evans prescribed Plaintiff one inhaler on March 27, 1995 (Pl.'s Resp. Ex. 3, Evans Dep. at 19-26; Pl.'s Resp. ¶ 11), and added a second one on June 12, 1995. (Pl.'s Resp. Ex. 3, Evans Dep. at 28.) Ms. Bond began using the home nebulizer on May 9, 1996. (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 59-61.) By January 8, 1997, Ms. Bond was also using Proventil and Vanceril metered dose inhalers. (Pl.'s Resp. ¶ 11) On May 2, 1997, Dr. Evans prescribed Predisone and Biaxin. (Id.) Therefore, it is clear that Dr. Evans prescribed progressively more treatment for Ms. Bond while she was an employee at the CCDOC.

[17] See, supra, n. 7.

away from the workplace.[18]

Nonetheless, questions remain regarding the severity of Ms. Bond's asthma, since Dr. Evans considered Ms. Bond's asthma to be "mild persistent," and indicated that most asthmatic patients are able to continue working with some form of medical treatment.[19] (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 53.) Furthermore, Defendant contends that, during the years that Ms. Bond complained about the

---

[18] These activities include, for example, dancing, jumping rope, and "church activities," which include volleyball and badminton. (Pl.'s Resp. Ex.1, Bond Dep. at 99.) This is particularly important because the court in *Warren v. Jostens, Inc.*, No. 99-C8302, 2001 WL 290621, at * 2 (N.D. Ill. March 19, 2001), determined that the plaintiff was not substantially limited in the major life activity of breathing, in part, because she participated in aerobics outside of work – an activity that Ms. Bond presumably could not do. The *Warren* court also found that the plaintiff's asthma was adequately "controlled". *Id.* Here, however, as explained *supra*, there are material facts in dispute as to whether Ms. Bond's asthma was adequately controlled while she was an employee at the CCDOC.

[19] As discussed *supra*, when making its decision as to whether Plaintiff's asthma constitutes a disability under the Act, the factfinder must consider the medications Ms. Bond took to mitigate the affects of her asthma. *Sutton,* 527 U.S. at 482. Such medications include inhalers, a home nebulizer, and intermittent courses of Prednisone. (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 100.) Additionally, other factors that should be considered in determining whether an impairment is substantially limiting include (1) the nature and the severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the actual or expected permanent or long term impact of the impairment. *Harrington v. Rice Lake Weighing Systems, Inc.,* 122 F.3d 456, 459 (7th Cir. 1997) (*citing* 29 C.F.R. § 1630.2(j)(3)(i)).

smoking policy violations, she continued to accrue sick days that she did not use, and continued to work overtime, thereby implying that she was not as bothered by the "toxic" air as she claims. Ms. Bond counters, however, that her dedication as an employee should not be held against her. Given the conflicting evidence, as in *Riemer*, it is for the factfinder to determine whether Ms. Bond was substantially limited in the major life activity of breathing.

## 2. *Major Life Activity of Sleeping*

Ms. Bond's assertion that she is substantially limited in the major life activity of sleeping is unconvincing based on the evidence before the Court. Plaintiff relies upon the deposition testimony of Dr. Evans, who stated that Ms. Bond visited her office, on May 9, 1996, due to asthmatic complications. (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 59.) During this visit, Dr. Evans observed that "[Ms. Bond's asthma] seemed to be getting worse, especially with the nighttime awakening." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 60-61.) In her deposition testimony, Dr. Evans explained that "[p]eople with asthma usually die at night. Waking up at night short of breath is not a good sign. Patients tell you that they're awakening at night short of breath and more symptomatic during the day, then you have to step up the treatment somewhat." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 61.) Ms. Bond did not offer any

21

additional evidence demonstrating that she is substantially limited in the major life activity of sleeping.

Defendant points to two convincing cases to rebut Ms. Bond's contention that she is substantially limited in the major life activity of sleeping. In light of the facts in the record, the Court finds these cases particularly persuasive. In *Silk*, *supra*, the plaintiff suffered from severe sleep apnea, a condition that can cause extreme breathing difficulties while sleeping, cause or exacerbate hypertension, and put the sleep apneic at risk of acute heart conditions and stroke. 1997 WL 790598, at *2. The plaintiff in *Silk* produced medical evidence demonstrating that, even when working during the day shift, his "oxygen saturation level is only borderline and his blood pressure rises when he is sleeping, which are signs of the breathing problems associated with sleep apnea." *Id.* at *7. Furthermore, a sleep specialist testified that the plaintiff did not get a sufficient amount of sleep, particularly of quality sleep. *Id.* Accordingly, the court found that the plaintiff had put forth enough evidence from which a reasonable jury could determine that he had been substantially limited in the major life activity of sleeping. *Id.* at *8.

Conversely, in *Kolecyck-Yap v. MCI Worldcom, Inc.*, No. 99 CV

8414, 2001 WL 245531, at *10 (N.D. Ill. March 12, 2001), the court granted the defendant's motion for summary judgment, because the plaintiff failed to produce evidence establishing the severity of the plaintiff's sleep apnea. Specifically, the court emphasized that "[u]nlike in the *Silk* case, there are no facts in the record of this case which reveal [the plaintiff's] oxygen saturation levels while she slept, her hypertension levels, her increased blood pressure levels, nor how many hours [the plaintiff] slept during the night." *Id.*

In the case *sub judice*, Ms. Bond has failed to provide any evidence from which a reasonable jury could find that she is substantially limited in the major life activity of sleeping. The record does not indicate the severity of Ms. Bond's sleeping problems, how long she experienced difficulty sleeping, or how it affected her daily life. Rather, Dr. Evans' deposition testimony provides only general observations and conclusory statements that do not specifically address Ms. Bond's sleeping condition. (*See* Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 60-61.) Furthermore, there is no evidence in the record indicating, even remotely, how Ms. Bond was ever "substantially limited" in the major life activity of sleeping. Dr. Evans merely indicates that Ms. Bond experienced

"nighttime awakening." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 61.) Consequently, no rational jury could conclude that Plaintiff is substantially limited in the major life activity of sleeping.

### 3. *Major Life Activity of Walking*

The Court also rejects Ms. Bond's suggestion that she is substantially limited in the major life activity of walking. Ms. Bond testified in her deposition that she "has problems walking generally and walking up and down stairs," "can no longer talk while she is walking without becoming short of breath," and her "walking has gotten worse over the years as a result of her difficulty breathing." (Pl.'s Resp. ¶ 67.) Plaintiff also indicates that, as of April 13, 2000, "[she] was able to walk only about two block [sic] at a very slow pace before feeling short of breath." (Pl. Resp. ¶ 67.)

Based on this evidence, the Court concludes that, similar to the plaintiff in *Puoci v. City of Chicago*, 81 F. Supp.2d 893, 896-97 (N.D. Ill. 2000), Ms. Bond's limitations constitute only moderate restrictions on walking. In *Puoci*, it was undisputed that the plaintiff "walks with a limp, he has pain and discomfort when walking on soft surfaces, his right leg and right thigh go numb when he walks, and he can only walk for 1 ½ miles without pain." *Id.*

Notably, the court concluded that the plaintiff was not disabled because he "walks without assistance of a cane or crutch," "is not subject to medical restrictions on walking," and the plaintiff produced "no evidence that his difficulty walking interferes with his ability to care for himself." *Id.*

Similarly, although the plaintiff in *Moore, supra*, 221 F.3d at 948, suffered from rheumatoid arthritis, which "is an inflammatory disease of the joints that causes the joints to swell and to stiffen", the court found that his illness did not rise to the level of a disability, because it did not place "'significant restrictions' on [his] ability to walk." *Id.* at 951. In reaching this conclusion, the court noted that the plaintiff admitted that his condition did not prevent him from consistently walking distances up to a mile, and that his arthritis affected more the "rate and pace" of his activities as opposed to his ability to perform them. *Id.*

Because Ms. Bond has failed to demonstrate that her walking difficulties have interfered with her ability to care for herself, have required her to use a cane or crutch, or have placed significant restrictions on her ability to walk, the Court concludes that the evidence is insufficient for a reasonable jury to conclude

that she is substantially limited in the major life activity of walking.

### 4. Major Life Activity of Working

A person is substantially limited in the major life activity of working only when she is "precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 492. Under the ADA, it is the plaintiff's burden to put forth evidence demonstrating that, due to her impairment, she is limited from an entire class of jobs. *Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 998 (7th Cir. 2000). Thus, in order to defeat Defendant's Motion for Summary Judgment, Ms. Bond must set forth specific facts creating a genuine issue of material fact as to whether her impairment substantially limited her employment generally.[20] *See id.* at 999.

In the case at bar, Ms. Bond has failed to produce evidence that she was precluded from employment other than that of a

---

[20] Such reasoning is well established in the Seventh Circuit. *See, e.g., E.E.O.C. v. Rockwell Intl. Corp.*, 243 F.3d 1012, 1018 (7th Cir. 2001) (requiring plaintiffs to produce at least some evidence from which a jury might infer that they faced "significant restrictions" in their ability to meet the requirements of other jobs); *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998) (finding that the plaintiff must provide some evidence establishing a genuine issue of material fact over "whether her condition resulted in her being substantially limited from employment generally").

correctional officer at the CCDOC.[21] She has not provided the Court with any evidence from which it can be determined "whether her impairment forecloses her from accepting a few, many, or most jobs in a particular class or in a broad range of classes." *Skorup*, 153 F.3d at 515. Rather, Ms. Bond merely states that she has not been employed since leaving the CCDOC in 1998, and has not actively sought employment elsewhere due to her asthmatic condition. (Def.'s SUF Ex. 10, Bond Dep. at 16.) Therefore, she has not put forth sufficient evidence that she is substantially limited in the major life activity of working.

In sum, there are material facts in dispute concerning whether Ms. Bond is substantially limited in the major life activity of breathing - but not in sleeping, walking, or working.

---

[21] In *Muller v. Costello,* 187 F.3d 298, 313 (2nd Cir. 1999) - a case not cited by either party - the Second Circuit found that a correctional officer whose asthma was aggravated by secondhand smoke at the workplace failed to create a jury question with respect to being substantially limited in the major life activity of working, because the plaintiff "presented no evidence that he was precluded from jobs other than correctional officer in his geographic area." (The *Muller* court also found that the plaintiff was not substantially limited in breathing, but that conclusion was drawn, in part, because the plaintiff in *Muller* testified that he "was physically active outside of work." *Id.* at 314. Here, however, as discussed *supra*, there is evidence that Ms. Bond is substantially limited in breathing, as she had difficulty with activities both at work and elsewhere.)

## B.   "Qualified Individual"

A genuine issue of material fact exists regarding whether Ms. Bond is a "qualified individual" for purposes of the ADA.  To meet the "qualified individual" standard, Ms. Bond must demonstrate that (1) she possesses the "skill, experience, education and other job related requirements" of the position she holds or seeks; and that, (2) with or without reasonable accommodation, she is able to "perform the essential functions" of the position. *Ross v. Indiana State Teacher's Ass'n. Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998)(citations and quotations omitted).  It is the plaintiff's burden of proof to show that she is a "qualified individual." *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996).

The record indicates, and, for purposes of this Motion only, Defendant does not dispute, that Ms. Bond possessed the requisite skill, experience, education, and other job-related requirements of her position at the CCDOC.   (Def.'s Memo. at 10.)   However, a genuine issue of material fact does exist as to whether Ms. Bond could perform the essential functions of her position with or without reasonable accommodation.   Both parties agree that the cause of asthma is unknown, and that almost anything can trigger an asthma attack, such as pollen in the air, dust, fumes, cigarette

28

smoke, perfume, cologne, hair products, animals, birds, change in temperature, humidity, cold and heat." (Def.'s SUF ¶ 18.) Because any one of these irritants could have exacerbated her asthma, the decisive issue for the Court to consider is whether Plaintiff truly could, in fact, have been reasonably accommodated.

Ms. Bond asserts that she could have continued to perform her job had Defendant accommodated her request of placing her in a smoke-free work environment. Plaintiff relies heavily upon Dr. Evans' statement that cigarette smoke "was the only thing that consistently seemed to aggravate [Ms. Bond's asthma]." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 49.) Dr. Evans formed her opinion from the fact that "cigarette smoke is a known irritant" that "can aggravate anybody's asthma," and after hearing Ms. Bond's numerous complaints regarding the environmental tobacco smoke at the CCDOC. (*Id.*) Dr. Evans further stated that, although many asthmatics can continue working with proper treatment, whether such a person can continue working depends on their work environment. (Pl.'s Resp. Ex. 3, Evans Dep. at 53.) According to Dr. Evans, in most instances where a person is unable to continue working, it is because of a specific irritant in the workplace. (Pl.'s Resp. Ex. 3, Evans Dep. at 54.) The record indicates that cigarette smoke was present at the CCDOC. (Pl.'s Resp. Ex. 5.)

Defendant adamantly contends that Ms. Bond could not have been reasonably accommodated, and, thus, could not have performed the essential functions of her job. Defendant claims that Plaintiff misquotes Dr. Evans' testimony indicating her belief that cigarette smoke is the primary irritant of Ms. Bond's asthma, and that, even if quoted accurately, Dr. Evans' opinion should be given no deference because she is not an expert in asthma treatment. Defendant also argues that he is free from liability because Ms. Bond failed to explore any other possible causes for her asthmatic condition beyond cigarette smoke at the CCDOC.

The Court is not persuaded by these arguments. First, Plaintiff did not misquote Dr. Evans' deposition testimony.[22] Second, while it is true that Dr. Evans did not pursue a specialization in the diagnosis and treatment of asthma, she was Plaintiff's treating physician and board certified in internal medicine (Pl.'s Resp. ¶ 53), and Defendant failed to put forth

---

[22] Defendant states that Plaintiff misquotes the record when arguing that cigarette smoke "was the only thing that consistently seemed to aggravate Bond's asthma," and states that the correct quote is "since the only thing [Ms. Bond] consistently reported was aggravating of the cigarette smoke and since public buildings are supposed to be smoke free, that's why she was complaining [of] the fact that they were still smoking in the environment." (Pl.'s Resp. Ex. 3, Dr. Evans Dep. at 49-50.) However, both quotes appear in Dr. Evans' deposition. The quotation that Plaintiff cites appears on page 49 at lines 17-18; the quotation Defendant cites appears on page 50 at lines 18-23.

medical testimony of its own to rebut Dr. Evans' beliefs and conclusions.[23]   Finally, because Defendant has failed to proffer evidence indicating that secondhand smoke was not the only cause or irritant of Ms. Bond's asthma, and because Plaintiff has submitted evidence (largely through Dr. Evans) that it primarily was, this issue remains for the factfinder.[24]   Thus, there are material facts in dispute as to whether Plaintiff was a "qualified individual" under the ADA.

### C.   Adverse Employment Action or Failure to "Reasonably Accommodate"

To state a viable claim under the ADA, Plaintiff's final task is to demonstrate that Defendant either took an adverse employment action against her, or failed to "reasonably accommodate" her disability.  *Stevens, supra*, 210 F.3d at 736.  Ms. Bond contends that Defendant both constructively discharged her and failed to

---

[23] Ultimately, it will be up to the factfinder to determine the weight to give to Dr. Evans' testimony.

[24] Defendant correctly observes that Ms. Bond "continues to experience asthmatic symptoms, despite the absence of cigarette smoke from her daily environment."  (Def.'s Memo at 11.) However, Dr. Evans also explained in her deposition that Plaintiff's asthma is now "controlled", but implied that, when Plaintiff worked at the CCDOC, it was uncontrolled, because she remained symptomatic despite her treatment.  (*See, supra*, n. 10.) Again, it is a factual issue for the jury to determine whether tobacco smoke was the trigger of Plaintiff's asthma while she worked at the CCDOC, and whether she could have been reasonably accommodated.

reasonably accommodate her asthma.

###### 1. *Adverse Employment Action: Constructive Discharge*

Defendant asserts that, effective February 28, 1998, Ms. Bond voluntarily resigned her employment at the CCDOC in order to retire. (Def.'s SUF ¶ 3.) The exit interview form that Plaintiff signed reflects that, despite being given the opportunity to list reasons for her resignation (which included "illness" and "dissatisfaction with working conditions"), Ms. Bond indicated "retirement" as the only reason for leaving the CCDOC. (Def.'s SUF ¶ 3.) Plaintiff contends that her retirement was not truly voluntary; rather, she was forced to retire as a result of the negative effects of her working conditions on her health caused by environmental tobacco smoke in the workplace. (Pl.'s Resp. ¶ 3.) Ms. Bond further explains that the exit interview form only reflects "retirement" as the reason for her resignation, because she only signed and dated it, and, significantly, did not herself write down "retirement" as her reason for leaving.[25]

---

[25] Defendant, relying on *Jones v. Merchant's Nat. Bank and Trust Co. of Indianapolis*, 42 F.3d 1054 (7th Cir. 1998) and *Patterson v. Chicago Ass'n. For Retarded Citizens,* 150 F.3d 719 (7th Cir. 1998), repeatedly argues that many of Ms. Bond's statements are merely "self-serving," and, thus, cannot overcome a motion for summary judgment. However, these cases are inapposite to the case *sub judice.*
  In *Jones,* the plaintiff alleged that her employer

(continued...)

(...continued)
discriminated against her by denying her a promotion to an entry-level officer position. 42 F.3d at 1059. The defendant stated that such a promotion was only meant as the employer's acknowledgment of career progress, and did not carry an increase in salary, responsibility, or workload. *Id.* In opposing the defendant's motion for summary judgment, the plaintiff offered no evidence to rebut the defendant's contention, simply stating that, "[o]bviously, [she] would have had more responsibility, more prestige, and other opportunities" had she been promoted. *Id.* The court granted defendant's motion for summary judgment, because the plaintiff failed "to submit evidence of recent officer promotions which established that pay increases, supervisory responsibilities, and other duties or benefits regularly accompanied the change in status." *Id.*

In the case *sub judice*, Ms. Bond offers specific examples to rebut Defendant's contentions. For example, although Defendant argues that Plaintiff's "assertion that the no smoking policy was never enforced is based on a self serving affidavit without factual support," the record offers sufficient evidence to support Ms. Bond's contention. (Def.'s SUF Reply ¶ 30.) Specifically, Plaintiff offers Lieutenant Collier's deposition testimony which indicates that he has seen cigarette butts on the floor in no-smoking areas (Pl.'s Resp. Ex. 12, Collier Dep. at 32), the results from the University of Illinois at Chicago ventilation evaluation which recommended "limit smoking" at the CCDOC (Pl.'s Resp. Ex. 5 at p. 12), and a letter from the IDOL indicating that the "[s]moking [p]olicy was not enforced" at the CCDOC (Pl.'s Resp. Ex. 14.) Accordingly, the Court concludes that *Jones* is not applicable to the facts *sub judice*.

In *Patterson*, the plaintiff responded that she could not recall, or did not know the answers to proffered questions, on 255 occasions during her deposition. 150 F.3d at 723. The plaintiff then submitted an affidavit that was significantly more detailed than her deposition testimony, and specifically addressed incidents included in the defendant's motion for summary judgment. *Id.* at 724. Because "no independent evidence could be found in the record that would support her claims," the court granted summary judgment in favor of the defendant. *Id.* The court reasoned that "[a]n affidavit cannot be used to create

(continued...)

33

(Pl.'s Resp. Ex. 3, Bond Dep. at 157; Pl.'s Resp. ¶ 3.)

The Seventh Circuit has yet to determine "whether a claim of constructive discharge stemming from a hostile work environment is cognizable under the ADA." *E.E.O.C. v. Sears, Roebuck and Co.,* *supra*, 233 F.3d at 440. However, at least one recent case in this jurisdiction supports Plaintiff's contention that such a claim should be allowed under the ADA. *See Seisser v. Platz Flowers and Supply, Inc.*, 129 F. Supp.2d 1130, 1136 (N.D. Ill. 2000)(allowing constructive discharge claim in an ADA case to be tried by jury).

To plead a claim of constructive discharge, a plaintiff must (1) demonstrate "that she was constructively discharged — that the employer made the working conditions so intolerable as to force a reasonable person to leave;" and (2) "establish that she was constructively discharged on account of her disability." *Sears, Roebuck and Co., supra*, 233 F.3d at 440 (citations omitted). The

_____

(...continued)
a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable." *Id.* at 720.

Here, Ms. Bond did not contradict deposition testimony in her affidavit, nor did she use her affidavit to "gap-fill" her deposition testimony in an effort to stave off Defendant's Motion for Summary Judgment. Rather, Plaintiff used her affidavit to complement her deposition testimony with additional information that is supported by the record. This is but one of the many legitimate uses of an affidavit.

Court notes that a complaining employee is expected to remain working while pursuing redress, "[u]nless conditions are beyond 'ordinary' discrimination." *Id.* at 440-441. All circumstances are taken into account when determining whether a particular employment action constitutes a constructive discharge. *Yates v. Reliance Elec. Co.*, No. 84-3218, 1989 WL 100747, at *3 (C.D. Ill. June 2, 1989).

The circumstances surrounding Ms. Bond's resignation create a factual dispute that must be resolved by a factfinder. Although Ms. Bond's exit interview form clearly indicates that she voluntarily resigned from the CCDOC in order to retire, a rational jury could determine that she was, nevertheless, constructively discharged from her position. For example, a jury could conceivably conclude that Ms. Bond had no choice but to retire from the CCDOC because Defendant habitually refused to enforce its own non-smoking policies, despite Plaintiff informing Defendant of her asthmatic condition and complaining about the non-smoking policies for several years. Furthermore, a jury could believe that Plaintiff merely perfunctorily signed the exit interview form, and did not affirmatively characterize her leaving as retirement *per se*. However, a jury could also determine that Ms. Bond chose to retire

voluntarily from the CCDOC, since she was eligible for a retirement pension based upon her twenty years of service, had continued to work in a "smoke-filled" environment for years, and has not attempted to secure employment elsewhere since leaving the CCDOC in 1998. Therefore, there are factual issues in dispute as to whether Plaintiff voluntarily resigned from the CCDOC or was constructively discharged.

### 2. "Reasonable Accommodation"

A genuine issue of material fact also exists regarding whether Defendant reasonably accommodated Ms. Bond's asthma. Defendant argues that he is free from liability because Ms. Bond never made an appropriate request for accommodation for her asthma. Defendant also asserts that, even if Ms. Bond is "disabled" and a "qualified individual" for purposes of the ADA, liability cannot be imposed because Defendant reasonably accommodated her, such as transferring her to Division VIII in 1993, and enforcing the non-smoking policies.[26] However, the Court finds that there are material facts

---

[26] Defendant erroneously relies on *Garza v. Abbott Laboratories*, 940 F. Supp. 1227, 1240 (N.D. Ill. 1996) to argue that Plaintiff's insistence that the enforcement of the non-smoking policy would have been a reasonable accommodation for Plaintiff's alleged disability is sheer speculation. However, unlike the plaintiff in *Garza*, who only offered speculative testimony regarding the effectiveness of a certain accommodation (i.e split keyboard), Ms. Bond has presented evidence (largely
(continued...)

in dispute as to whether Defendant reasonably accommodated Plaintiff's alleged disability.

First, Plaintiff has presented ample evidence indicating that she made numerous requests, both directly and indirectly, to Defendant to be placed in a smoke-free work environment because of her asthma.[27]   Although Ms. Bond never stated the magic words

─────────────────

[26](...continued)
through Dr. Evans) that her asthma was primarily triggered by tobacco smoke.  Therefore, a factfinder could reason that enforcement of the non-smoking policy could have been an effective and reasonable accommodation for Ms. Bond's asthma.

[27] Plaintiff has submitted evidence that (1) a doctor from Humana recommended that Ms. Bond "should completely be in a non-smoking environment" (Def.'s SUF Ex. 22); (2) she complained, on November 11, 1993, to IDOL about being exposed to secondhand smoke at her workplace (Pl.'s Resp. Ex. 8); (3) she made a second complaint to IDOL, on March 3, 1995, regarding secondhand smoke at her workplace (Pl.'s Resp. Ex. 8); and (4) Dr. Evans wrote three "To Whom It May Concern" letters stating (a) that Ms. Bond has asthma, which is aggravated by tobacco smoke; (b) that she should be transferred to an area free of the above conditions (listing several irritants, including cigarette smoke); and (c) that she continues to suffer from asthma. (Def.'s SUF Ex. 23-25.) Furthermore, according to Ms. Bond, in June of 1995, when she was working in the smoke-filled tunnel position at the CCDOC, she informed her supervisor, Sergeant Caliendo, that she was having difficulty breathing and asked if she could leave the area. (Pl.'s Resp. ¶ 57.)  Sergeant Caliendo refused her request, and when she went to get her inhalers, he threatened to write her up. (*Id.*)  When she requested to go to Cermak Hospital because she could not breathe, Sergeant Caliendo responded that he had to call his supervisor.  (*Id.*)  According to Ms. Bond, fifteen to twenty minutes later, she was allowed to go to Cermak.  (*Id.*) If true, this represents another example of Ms. Bond's supervisor being aware that she had a breathing problem exacerbated by tobacco smoke.

"reasonable accommodation", the Court believes there is little more Ms. Bond could have done to inform Defendant that she required an accommodation for her asthma. *See Branson v. West,* No. 97 C 3538, 1999 WL 311717, at * 13 (N.D. Ill. May 11, 1999) ("[A]n employee is not required to use the magic words 'reasonable accommodation' . . ."); *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir. 1996) ("[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

The Court also finds that a rational jury could determine that Defendant failed to reasonably accommodate Ms. Bond. While Defendant provides evidence of taking at least three measures to accommodate Ms. Bond, a factfinder could conclude that these so-called measures were not reasonable accommodations. First, on May 11, 1993, Defendant administratively transferred Ms. Bond from her records position in Division V to a position in Division VIII, which Defendant argues is the only "smoke-free" area at the CCDOC. Defendant claims that the purpose of this transfer was to grant Ms. Bond's request of working in a smoke-free environment. Second, after Plaintiff successfully grieved her transfer back to the records department in Division V, Defendant placed Ms. Bond on the

midnight shift, so that she would be working with fewer people, and therefore, around fewer people smoking.[28] Defendant argues that Plaintiff rejected this reasonable accommodation by bidding into the day shift of classification in Division V after working the midnight shift in records for three months. Third, Defendant states that he accommodated Ms. Bond by enacting General Order 1.16 in 1993 and the 1996 "Smoking Policy."[29]

Plaintiff offers contradictory evidence to Defendant's so-called reasonable accommodations, thus creating issues of material fact for a factfinder to resolve. First, Ms. Bond argues that her transfer to Division VIII, in 1993, was not to a smoke-free environment; rather, according to Plaintiff, Cermak Hospital is the only smoke-free area within Division VIII, and she was not placed in that area. (Pl.'s Resp. ¶ 88.) Additionally, Ms. Bond indicates that there were approximately twenty openings for correctional

---

[28] The Court notes that the sheer number of people in the area is irrelevant; rather, the critical factors are the number of smokers and the amount of smoke produced in the area during a given shift. Since Defendant has failed to provide evidence indicating that there is less smoke in the air during the midnight shift, he has not demonstrated that this transfer was, as a matter of law, a reasonable accommodation.

[29] While there is some mention in Ms. Bond's deposition about a possible position in the Guard Tower (Def.'s SUF Ex. 10, Bond's Dep. at 101-102), Defendant does not argue in its Motion for Summary Judgment or Reply that it offered this position to Ms. Bond. Therefore, the Court will not consider whether this was an alleged fourth accommodation.

officers, such as herself, in this smoke-free area of Division VIII (Cermak Hospital) at all times from 1995 through mid-1998, yet Defendant failed to place her in one of these vacancies. (Pl.'s Resp. ¶¶ 101, 104.) Further, Plaintiff contends that her transfer to Division VIII, in 1993, was not made as an accommodation for her request, since she was one of four officers administratively transferred from Division V to Division VIII, and as explained *supra*, her transfer was not even to a smoke-free environment. (Def.'s SUF Ex. 27; Pl.'s Resp. ¶ 88.)

Finally, Plaintiff argues that General Order 1.16 and the 1996 "Smoking Policy" were not truly accommodations for her asthma, since these policies were never enforced. (Pl.'s Resp. Exs. 10, 14; Pl.'s Resp. Ex. 12, Collier Dep. at 32.) Ms. Bond supports her assertion with the results of the University of Illinois at Chicago indoor air quality and ventilation study conducted on February 28, 1997, which concluded, *inter alia*, "[s]moking is currently permitted in the facility for the inmates, officers, and other staff." (Pl.'s Resp. Ex. 5 at p. 3.)

Ms. Bond also argues that Defendant failed to engage in an interactive process with her, thus providing further evidence that

Defendant did not reasonably accommodate her asthma.[30] "An employee

has the *initial* duty to inform the employer of a disability before

ADA liability may be triggered for failure to provide

accommodations." *Beck v. Univ. of Wis. Board of Regents*, 75 F.3d

1130, 1134 (7th Cir. 1996)(emphasis added). Once the employee

provides this information, the employer has a responsibility to

start the interactive process. *Bombard v. Fort Wayne Newspapers,*

*Inc.*, 92 F.3d 560, 563 (7th Cir. 1996); *see also* 29 C.F.R. sec.

1630.2(o)(3) ("To determine the appropriate reasonable accommodation

it may be necessary for the covered entity to initiate an informal,

interactive process with the qualified individual with a disability

in need of the accommodation."). After an employee's request, both

parties bear responsibility for determining what accommodation is

necessary. *Bultemeyer, supra,* 100 F.3d at 1285. Once a

---

[30] The Seventh Circuit acknowledges that the interactive
process is useful for employers to fulfill their obligation of
identifying appropriate accommodations available to the disabled
individual, but warns that the failure to engage in such a
process does not create a *per se* violation of the ADA. *Rehling
v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000).
Thus, a plaintiff must do more than allege that the employer
failed to engage in an interactive process; she must demonstrate
that such conduct resulted in a failure to identify an
appropriate accommodation. *Id.* at 1016. In the case *sub judice*,
the breakdown of the interactive process resulted in the failure
to consider a transfer to a vacant position at Cermak Hospital –
arguably a reasonable accommodation.

disability has been summoned to the fore, determining what specific actions should be taken by an employer requires an interactive process, involving participation by both sides. *Beck*, 75 F.3d at 1135. Significantly, where missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown, and the party withholding the information may be found to have obstructed the process. *Id*. at 1135-36.

Plaintiff has produced copies of letters (several from her doctors) sent to employees at the CCDOC (Def. SUF Exs. 22-25), deposed several supervisors (Pl. Resp. Ex. 11, 12), and included copies of complaints directed to the IDOL, in order to demonstrate that she wanted an accommodation for her asthma. (Pl. Resp. Ex. 8.) Further, Ms. Bond supplied deposition testimony (from Superintendent Benn) indicating that there were vacant positions in the smoke-free area of Division VIII (Cermak Hospital) (Pl. Resp. ¶¶ 101, 104).

Defendant does not address Plaintiff's contention regarding the vacancies, choosing instead to rely upon the argument that he reasonably accommodated Ms. Bond. However, Defendant does state that "[Ms.] Bond made no additional efforts to transfer anywhere" after bidding into the classifications department; therefore,

implying that Plaintiff should have sought a specific transfer to Cermak Hospital. (Def.'s SUF ¶ 27.) Such a statement is misguided, since, presumably, an employer would be better situated to identify appropriate, available positions than the employee. *Zamudio v. Patla*, 956 F. Supp. 803, 808 (N.D. Ill. 1997)("Presumably, defendants would be more familiar with the available positions than plaintiff would be."). Furthermore, under the ADA, an employer must *attempt* to reassign the disabled individual to any vacant position for which he or she is qualified, including those that represent a demotion. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694-695 (7th Cir. 1998).

In the case *sub judice*, it is clear that Ms. Bond informed the CCDOC of her asthma. The record also indicates that Plaintiff repeatedly "asked" to work in a smoke-free workplace. Additionally, Plaintiff has presented sufficient evidence tending to show that CCDOC failed to engage in an interactive process with her in an attempt to identify a reasonable, appropriate accommodation for her asthma, such as a transfer to a vacancy at Cermak Hospital. (*See* Pl.'s Resp. ¶¶ 76-86, 89.) Therefore, there are material facts in dispute as to whether Defendant reasonably accommodated Plaintiff.

43

## Conclusion

For the reasons set forth above, the Court finds that genuine issues of material fact exist regarding whether Ms. Bond is (1) substantially limited in the major life activity of breathing (but not sleeping, walking, or working); (2) a "qualified individual" under the Act; and (3) whether Defendant reasonably accommodated her, or took an adverse employment action against her.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, DENIED.


Dated: July 19, 2001          Enter:


ARLANDER KEYS
United States Magistrate Judge